# Court of Appeals
## Tenth Appellate District of Texas

---

10-24-00244-CR

---

Keandre Foley,
Appellant

v.

The State of Texas,
Appellee

---

On appeal from the
82nd District Court of Robertson County, Texas
Judge Bryan F. Russ Jr., presiding
Trial Court Cause No. 21-09-21454-CR

---

JUSTICE HARRIS delivered the opinion of the Court.

## MEMORANDUM OPINION

A jury found Keandre Foley guilty of failing to stop and render aid, a second degree felony. *See* TEXAS TRANSP. CODE § 550.021. The trial court assessed punishment and sentenced Foley to 12 years in prison. We affirm the trial court's judgment.

**BACKGROUND**

Robert Dawson, Jr. was hit and killed by a vehicle on the evening of

November 2, 2020. The driver of the vehicle did not stop. Evidence at the scene led law enforcement to a vehicle which Foley had been driving that evening. Foley denied hitting anyone. Dawson's DNA was located on the underside of the vehicle.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Foley contends that the evidence is insufficient to support his conviction.

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The court conducting a sufficiency review must not engage in a "divide and conquer" strategy but must consider the cumulative force of all the evidence. *Villa*, 514 S.W.3d at 232. Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (*citing Jackson*, 443 U.S. at 319); *see also Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We presume that the factfinder resolved any

conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This is because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13.

We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.; *see also Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013). The "law as authorized by the indictment" includes the statutory elements of the offense and those elements as modified by the indictment. *Daugherty*, 387 S.W.3d at 665.

*Zuniga v. State*, 551 S.W.3d 729, 732-33 (Tex. Crim. App. 2018).

### *Failure to Stop and Render Aid*

Foley specifically argues that the evidence is insufficient because the State failed to prove beyond a reasonable doubt that Foley knew, or reasonably should have known, that his vehicle struck a person. He contends that the evidence, when viewed cumulatively, establishes that he could not have known or be reasonably expected to know that he struck a person. But that is not the

standard to be proved in this type of offense.

A person commits the felony offense of failure to stop and render aid if he operates a vehicle involved in an accident that results or, as it pertains to this case, is *reasonably likely* to result, in injury to or death of a person and fails to:

> (1) immediately stop the vehicle at the scene of the accident or as close to the scene as possible;
>
> (2) immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident;
>
> (3) immediately determine whether a person is involved in the accident, and if a person is involved in the accident, whether that person requires aid; and
>
> (4) remain at the scene of the accident until the operator complies with the requirements of [Transportation Code] Section 550.023.

*See* TEX. TRANSP. CODE § 550.021(a),(c); *Boudreaux v. State*, 631 S.W.3d 319, 327-28 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd).

Prior to 2013 when the statute was last amended, the former versions of it drew a black and white line: either the driver knew he was involved in an accident and someone was injured or killed, or he did not. *Curry v. State*, 622 S.W.3d 302, 309 (Tex. Crim. App. 2019). But in adding the "reasonably likely" theory, the legislature introduced probabilities into the statute where there previously were none. *Id.* Now, a driver must stop and render aid *not only* if the driver knows that he was involved in an accident and another person was

injured or killed, which was the basis of the Court of Criminal Appeals decisions in *Huffman* and *Goss*,[1] *but also* if the driver knows that he was involved in an accident that was *reasonably likely* to result in injury to or the death of a person.[2] *Id.*

The culpable mental state for this offense "is established by showing that the accused had knowledge of the circumstances surrounding his conduct, meaning the [accused] had knowledge that an accident occurred, and the accident was reasonably likely to result in injury or death of a person." *Boudreaux v. State,* 631 S.W.3d 319, 327-28 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). Thus, the question in this case is not whether the evidence is sufficient to show Foley knew or could reasonably be expected to know that he struck a person, but rather whether Foley knew he was involved in an accident and that accident was reasonably likely to result in injury to or the death of a person.

### *Evidence in the Light Most Favorable to the Verdict*

On the evening of November 2, 2020, the Hearne Police Department was

---

[1] *Huffman v. State*, 267 S.W.3d 902, 908 (Tex. Crim. App. 2008); *Goss v. State*, 582 S.W.2d 782,785 (Tex. Crim. App. 1979).

[2] The Court of Criminal Appeals has noted that a driver does not have to stop and render aid if he does not know he was involved in an accident, if he knows he was involved in an accident and knows it did not result in injury to or the death of a person, or if he knows he was involved in an accident, but it was not reasonably likely the accident would result in injury to or the death of another person. *Curry v. State*, 622 S.W.3d 302, 309 (Tex. Crim. App. 2019).

notified through two sources that debris was seen in one lane of a two-lane roadway, Old Franklin Highway. One report came from the local fire department. A person had reported to the department that an apparent accident had occurred because of debris in the road and a bicycle just off of the road. The reporting person testified at trial that all the debris, which looked like gray wires and Styrofoam, was confined to one lane. This person testified that he saw something else but did not know if it was a body because it was dark outside. Because his cellphone was not working, the reporting person turned his vehicle around and drove back to Hearne to report to the fire department what he had seen.

The second reporting person happened upon the same debris as she drove up the only hill on Old Franklin Highway. She began to slow down, and as she continued just over the hill, she realized that someone was lying on their side in the middle of the road. She was almost beside the body before she could tell that the body was a human. She did not know if the person was alive or dead, so she turned her vehicle around to direct her headlights toward the person, got out, and checked on the person. The person was dead. The reporting person was already on the phone with 9-1-1 and told the operator, "He's passed." She also saw a "bike" in the main lane of the road. A volunteer firefighter arrived within minutes.

The Hearne Police Department's initial report came from dispatch as a man on a "bike" had been hit by a vehicle and was not breathing. At the scene, an officer observed a bicycle with its front tire and the seat, separated from it, in the grass next to the roadway.[3] The body lay further down the road in the lane of traffic. Biological material was located in a streak down the same lane from a pool of bodily fluid to where the body lay. It appeared to the first officer on the scene as though the body had been dragged and pieces of the body had been torn off by and deposited on the road. Other debris in the roadway consisted of cast off personal items, such as sunglasses, a wallet, a lighter, house keys, cigarettes, a belt-loop from the victim's jeans, and one of his boots, along with vehicle parts. Those vehicle parts included a piece of insulation, a front fender well identified as belonging to a Toyota Corolla, and a piece from the bumper also identified as belonging to a Toyota Corolla.

The victim was identified as Robert Dawson, Jr. He had sustained multiple exterior "blunt injuries." Those injuries included a large, gaping laceration exposing his skull, a gaping hip wound which exposed a great deal of underlying soft tissue of that area, and a compound fracture of his right arm. Dawson's internal injuries included bleeding between the lining of his skull and the next layer of his brain, bleeding in the subarachnoid tissue, in other

---

[3] The officer agreed that while the front wheel was misaligned and the seat was separated from the "bike," the "bike" did not look like it had been run over.

words, the next layer, of his brain, contusions of his brain tissue itself, and skull fractures at the base of his skull. He also had injuries to his organs which bled into his left chest cavity and abdominal cavity, lacerations in his liver, and multiple pelvic fractures. The medical examiner determined Dawson's death was caused by all of the "blunt trauma" which he sustained and which likely occurred by a vehicle running over his torso. The medical examiner also determined that Dawson was alive at the time the injuries occurred and found no injuries sustained after his death. Based upon the pattern of injuries, the medical examiner found it unlikely that Dawson had been run over by more than one vehicle.

The police obtained information that a Toyota Corolla was owned by someone living on Old Franklin Highway not far from the accident scene. Officers located the Toyota at the home as they had been informed. As they walked to the door of the house and passed by the Toyota, an officer immediately noticed a missing fender well and damage on the right side of the vehicle. He also noticed that other than the damaged side, the rest of the vehicle was very dirty.

Officers contacted Foley, the appellant in this case, in the home on Old Franklin Highway. Foley informed the officers that he drove the Toyota earlier that day around 4 p.m. He said that it was still light out at that time. He said

he returned home around "five-ish." He was asked to come to the station to give a statement, and he agreed to do so.

Foley recounted the occurrences of that day on several different occasions. Each time, there were significant discrepancies in the recitations. We attempt, hereafter, to summarize each of those versions[4] to reveal the evolution of and the discrepancies in those versions of his story.

At the station, Foley provided his first version of the story in which he initially denied having any type of accident. Foley related that he drove the Toyota to an auto parts store in Hearne, picked up a battery and a wire for a Buick, and returned home the same way. When asked if anything unusual happened on his way to Hearne or on his way back, Foley shook his head no. He then mentioned that the bumper of the Toyota was "already off" when he went to a bank[5] earlier that afternoon. Foley explained that he must have driven too fast up a steep hill by the bank and scraped the bumper. He went home and told his girlfriend that he thought he messed up the bumper. He then described the place where he scraped the bumper as a "little hill" going into the bank. He also clarified that the bumper was "messed up," not off.

---

[4] Each statement was recorded on an officer's body-camera and were not transcribed into a written format.

[5] The interviewing officer testified at trial that he did not know of a bank in Hearne with a hill or dip that would have caused the damage to the vehicle.

When asked again if anything unusual happened either on his way to the parts store or on the way home, Foley said that he just went there and back; "that was it, really." The interviewing officer told Foley that he could tell by Foley's body language that Foley was not being honest, and the officer again asked him what happened. Foley then said that he thought that he hit a "bike" going back home.

In initially describing the incident, Foley told the officer that he swerved and his friend, Leron Thomas, who was following him in a pickup, also swerved. Foley said that he looked back, and since Thomas kept going, Foley kept going. He said that no one was on the "bike;" it was on the ground. He also explained that he thought there was something else in the middle of the road, but "it was just a bike" so he kept going. He volunteered that he did not hit anyone. When asked what time it was that he hit the "bike," Foley responded, "about 4-ish," on his way home. He stated that he went to get a battery and came back. He again volunteered that he did not hit anyone. When asked where the "bike" was and if anyone was around it, Foley reiterated in this version of the story that he did not see anyone, but added that "it was dark."

Foley was next asked about how hard he struck the "bike." Providing a non-responsive answer, Foley stated that he was only going around "20-30, 30-

40" miles per hour. In answering the question moments later, he said that it was just a bump and demonstrated by slightly and quickly raising and lowering himself in his chair. The officer asked, "that fast?" Foley responded, "uh-huh." He also said that hitting the "bike" did not cause any further damage to the Toyota; the bumper was already "messed up." Foley again told the officer that he did not see anyone. He said Thomas was behind him, and if Thomas had seen anyone, Thomas would have stopped. Foley again relayed what happened, saying it was dark out, something went bump, and he thought, "hmm, what was that?" Foley said he looked back, and Thomas kept going so Foley went home.

The officer confronted Foley with the information that someone was hit.[6] In response, Foley said no one was riding the "bike;" he would have seen that. He repeated that he did not see anyone, and if he had, he would not have hit him; he would have stopped.

Foley was then informed that the debris at the scene matched the damage to the Toyota he was driving. However, Foley could not explain why the debris matched the Toyota. He did not know what an inner fender well was and did not know how it had come off of the Toyota. After being confronted about the Toyota debris at the scene, Foley stated that whatever was in the

---

[6] The video of Foley's interview depicted Foley's eyes widening a bit after receiving that information.

middle of the road was what he ran over. He repeated that it was dark out, that he swerved a little but still ran over it, and that there was no person. He said that he looked back and decided that there could not have been anything else in the road because Thomas did not stop. Yet again, he stated that he did not hit a person; it was the "bike" "or whatever I hit." He claimed that he had stopped and looked back. In this telling, Foley also said that Thomas did not say anything to him right then, by text or calling, so he went on. Foley again asserted that there was something in the road, but it was not a person; he did not see a body. When asked if any DNA would be found on his vehicle, Foley replied, "no sir."

On the last occasion that Foley described to the officer what happened, Foley said that something was in the middle of the road, and he could not see it. Foley then said, "boom," presumably as if describing how he hit something and told the officer that he said, "dang," presumably in response how it felt. Foley said that he looked back, and since Thomas did not stop, he kept going.

At his next interview five days later, Foley stated that he only ran over a "bike;" there was no human in the middle of the road or anywhere near the "bike;" no one was walking. When confronted with the biological matter found on the underside of the Toyota, Foley stated that there was no way that he would have run over anyone. He said that he had no idea how the biological

matter got on the underside of the vehicle. Upon retelling his story of what happened, Foley stated that Thomas came over and fixed Foley's car, a Buick, until 4:30 p.m. He knew the time because Thomas's kids were at football. They both left at 4:30 p.m. Thomas left to go to football, and Foley went to buy a battery and went home. He included that he and Thomas separately returned to the parts store at 5:50 p.m. Foley stated that he had to buy a new battery and a wire, and then he left. A receipt confirmed that a battery was purchased at 6:00 p.m. Foley and Thomas each drove down the road, and Foley saw a "bike" laying in the middle of the road. Foley said that he was only going 40 miles per hour; he stopped and looked back; it was dark; he did not see anything. When he arrived at home, Foley said that he told his girlfriend that he had "messed up" the bumper and had to put it back on. He explained that the fingerprints on the right side of the car were from the bumper repair. He also stated that the bumper was "messed up" from running over the "bike" and that if he had hit Dawson, Thomas would have seen it or would have also run over him. Thomas did not give a statement to police and did not testify.

Foley's girlfriend at the time of the accident, Marilyn Garcia, testified that when Foley came home on the evening of November 2, 2020, he told her that he had hit a ditch, and then shortly after telling her this, he told her that he had hit a "bike." She further testified that when she, her sister, her mother,

and her sister's boyfriend picked up Foley after being questioned by the police, Foley told them all that he had hit was a "bike." This was not, however, what Garcia had told police earlier.

After having her memory refreshed, Garcia acknowledged that when Foley came home, he asked her to help him with the bumper. She expected to see that the bumper had popped off as it had in the past. However, she told the officer that she did not know the bumper "was all that." At trial, she said she meant that the bumper was simply a little bit lower than usual. She also stated that Foley told her that he had hit a ditch by the bank[7] but did not tell her about hitting a "bike" until after he had talked with police at the station. After Foley told her he hit a "bike," she asked, "Why did you lie?"[8]

The Toyota was ultimately seized and put on a mechanic's lift in order to view any potential biological material on the undercarriage. Body pieces and blood were discovered from the front of the undercarriage to the very rear of it. The bodily pieces tested by the Department of Public Safety lab for DNA confirmed the material belonged to Dawson.

Foley called an accident reconstructionist, Steve Elkins, as his sole

---

[7] Garcia denied knowing the location of the ditch as by a bank until cross-examination. On redirect, she testified that she had no way of knowing, however, which bank in Hearne had a ditch by it.

[8] Previously, on cross examination, Garcia told the jury she did not believe Foley was lying to her about anything. However, on redirect, Garcia admitted she did think he was lying.

witness at trial. Elkins testified that based on the evidence, Dawson was hit while lying flat in the road. Elkins opined that Dawson may have been hit first by someone else on his right side as he walked down the road but that Dawson was lying down when he was run over. Elkins did not realize that this theory was contrary to the medical examiner's testimony.

Elkins also related what he believed Foley encountered and how he responded:

> He saw the bike, he swerved to miss the bike and felt an impact. Upon feeling the impact, he thought that he had hit the bike. And since he lived just a short ways up the road, he drove down to his place of residence, or where he was staying, got out, checked the vehicle at that time.

Elkins did not think the "bike" had been run over, which he agreed was inconsistent with one of Foley's accounts in which he said that he ran over the "bike." He also agreed that another of Foley's accounts, where he told an officer, "I saw something in the road. I swerved. I hit something. I looked back and saw a bike," was different than the information Elkins used in deciding what he believed had happened.

Elkins further testified that when lying on the ground, Dawson would be about 5 to 6 inches high and that a Toyota Corolla clears about 5 to 6 inches. He opined that if the Toyota ran over the top of Dawson's body, there would be a bump. He could not answer whether it would be more than a bump if the

incident also tore out the right front fender well of the vehicle and left as much biological material as was found on its undercarriage. He stated it would not be a "pretty sight," but it would happen in only a matter of seconds.

Elkins agreed that Foley had certain duties to perform after the accident which included stopping and returning to the accident and determining whether a person was involved in the accident. He also agreed that Foley did not do any of these things. However, he informed that jury that if he had seen something and swerved, and during the course of swerving, he hit it, looked in his rearview mirror or looked back and saw that it was only a "bike," he would not go back to the scene either.

### *Application*

It was within the jury's province to believe all, some, or none of each witness's testimony. Based on the evidence, the jury could have believed that although Foley may not have seen Dawson before hitting him, Foley, by changing his story repeatedly, driving a low clearance vehicle, hitting something so hard that it ripped a fender well from the vehicle, dragging what he hit down the road which deposited biological material on the road and all down the undercarriage of his vehicle, seeing a bicycle behind him, and lying to his girlfriend about what had happened who, in turn, testified falsely at trial, knew an accident occurred and that the accident was reasonably likely to

result in at least an injury or the death of a person. Further, in light of all of the evidence, the jury could have disbelieved Elkins, when he said that he would not have returned to the scene either.

Accordingly, after reviewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the evidence was sufficient to show Foley knew an accident occurred, and the accident was reasonably likely to result in injury or death of a person, and thus, the evidence was sufficient to support Foley's conviction.

Issue one is overruled.

## JURY INSTRUCTION

In his second issue, Foley contends that the trial court erred when it submitted a jury instruction that included statutory means of committing the offense not alleged in the indictment. None of the cases Foley cites in support of this issue stand for the propositions cited in his brief.[9] In other words, Foley has presented this Court with no case authority to support his issue that the trial court erred. *See* TEX. R. APP. P. 38.1(i); *Neville v. State*, 622 S.W.3d 99, 104 (Tex. App.—Waco 2020, no pet.). Thus, this issue is improperly briefed

---

[9] For example, Foley cites to *Gollihar v. State*, 46 S.W.3d 243 (Tex. Crim. App. 2001); *Ex parte Varelas,* 45 S.W.3d 627 (Tex. Crim. App. 2001), and *Bauder v. State*, 921 S.W.2d 696 (Tex. Crim. App. 1996), a case overruled by the Court of Criminal Appeals in *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007) as support for his issue. None of these cases involve the review of an erroneous jury charge and none of the pinpoint citations in these cases correlate with the concepts and quotations provided by Foley.

and presents nothing for review. *See id.*; *Solis v. State*, No. AP-77,109, 2025 Tex. Crim. App. LEXIS 795, at *35 (Crim. App. Oct. 30, 2025) (publish); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011).

His second issue is overruled.

**CONCLUSION**

Having overruled each of Foley's issues on appeal, we affirm the trial court's judgment.

_____
LEE HARRIS
Justice

OPINION DELIVERED and FILED: March 12, 2026

Before Chief Justice Johnson,
    Justice Smith, and
    Justice Harris
Affirmed
Do Not Publish
CR25

